Good morning, ladies and gentlemen, and welcome to the Ninth Circuit. We'll hear the cases in the order in which they appear on the day sheet. A word to the appellant's attorneys. If you wish to reserve any time for rebuttal, you have to monitor yourself. We will not remind you. All right. So the first case we have is Indirect Purchaser Class v. Samsung Electronics Co. Ltd. at Al. Good morning. May it please the Court. I'm Shanna Scarlett from Hoggins Furman. Would you get that microphone a little bit up? Because it's not amplifying your voice. Is that better, Your Honor? Much better. Good morning. Shanna Scarlett from Hoggins Furman, Sobel & Shapiro, representing the Appellant Indirect Purchaser Class. I'd like to reserve five minutes for rebuttal. We're here today on behalf of an antitrust class that was certified for the years 2003 through 2008. The evidence of the conspiracy here was overwhelming. It was sufficient, the Court held, for our class to take to trial and go to a jury presenting this evidence. Four executives went to jail, pleading guilty to bid rigging and price fixing. One defendant, HLDS, paid $21.1 million in fines. Class certification here was granted by the District Court in 2016. One year later, it denied decertification. It denied Daubert motions against plaintiff's expert, Dr. Flamm. And yet it granted summary judgment on two points. The first point being whether or not the overcharge due to this conspiracy was passed through to the indirect purchaser class, the consumers that purchased the computers. And the second point being whether or not damages for the class would be limited to Dell and HP computers only. It's those two points which the indirect purchasers challenge here today. Would you repeat your second point, please? I didn't quite get it. The second issue is whether or not damages that could be paid to the indirect purchaser class after a trial would be limited to Dell and HP computers only. It was the indirect purchaser class's position that the scope of the conspiracy were all computers. Dell and HP are the gorillas in the room. They represent 50 percent of the computer market in the United States. The indirect purchasers presented evidence of a broad conspiracy, one where the executives in the room agreed to stabilize the prices of the optical disk drives. If you don't succeed on your appeal on the pass-through issue, we don't have to consider the damages issue. That is correct, Your Honor. Thank you. Okay, please proceed. Starting with the first issue, whether or not the district court erred in finding that the indirect purchaser had not presented sufficient evidence of pass-through. The district court ruled that Dr. Flamm's report was not record evidence and was not supported by sufficient market facts. And that is where the indirect purchasers believe that he ignored the realms of record evidence that did exist. Starting first with the econometrics that we presented. The overcharge to the class was demonstrated using real-world data, data we subpoenaed from 100 different companies. We ended up having usable data for 24 companies. But he essentially, the district court essentially decided that your theory was consistent with that data, all those millions of data points, right? Consistent with? That is correct. Consistent with, but it's as if he believed it was theoretical. But this data was real-world data that participants in the marketplace had produced to the plaintiffs. He ruled that the methodology we used to test the pass-through of the overcharge was methodologically sound. He ruled that it was applied reasonably. There was no daubert motion granted against it. And under the Supreme Court's teaching in Tyson, once he ruled that evidence was admissible, that the expert report was admissible, that it should have been considered by a jury as evidence where the inference from that is that the overcharge was then passed through to the indirect purchaser class. The representativeness of this real-world data was deemed sufficient to go to the jury. It represented $101 billion in revenue. 324 million units were tested, almost 600,000 separate models of computers. I appreciate that, but I'm hoping you're going to get to this point that I think the district court relied upon, right? Which is that you got past the daubert hurdle, which is no small thing, for sure. And I can't really think of another case where I've seen both of these things happen, where somebody clears the daubert hurdle and then loses a summary judgment. I'll grant you that. But what he seemed to say is that your expert and your evidence could account for this. But, in fact, he thought that it lacked evidentiary support and that a jury really didn't have. A reasonable jury couldn't decide that it established pass-throughs. So what's wrong with that? It's a very narrow slice. I appreciate that. Why was the district court wrong? The district court was wrong because leaving aside all of the econometrics and the measurements that we made, there was an enormous amount of evidence developed during the case and presented at summary judgment that spoke to exactly what was happening in the market. Well, so forgive me for interrupting, but are you going to get to the – that's what bothers me most, that there were so many deposition soundbites from retailers saying, well, actually we don't pass through, we wouldn't necessarily pass through. So what about all of those? You know what I'm talking about, Best Buy, Circuit City, all of those folks. I do. And when you look at the questions that were asked to those retailers in the snippets that the defendants produced and in the paragraphs of the declarations, the questions being posed were, if costs were increased, would you have passed that on to consumers? And the answer to that is uniformly no. And the reason for that is this, costs didn't increase in this market. Well, they're not uniformly anything, which is one of the problems I've got. They said, well, not necessarily or maybe not, or if it wasn't a big enough cost increase, why would we do the paperwork? So that is the question of whether or not it's a cost increase. When asked the question of if the costs were decreased to you, Best Buy, would you pass those on to the consumer? And their answer to that is yes, because of the intensely competitive market for computers. So Best Buy, if it's charging $900 for a computer and its supplier increased the cost, which Best Buy said never happened, it would not increase the cost to consumers because it would no longer be competitive. But when asked the question, the market participants, when asked, would you decrease the cost to consumers if you were given a decrease by your suppliers? Their answer is uniformly yes. And that is because of the function of the incredibly competitive retail market for electronic goods to consumers in the United States. So that is the narrative of the indirect purchase request. Doesn't that interfere with your argument? Doesn't that point contradict your argument? Are you asking about the causation, of whether or not the cause of the overcharge then is due to the cartel? No, the record suggests, in my opinion, shows that the argument was we didn't pass that along. And you're suggesting you didn't pass it along because of the competition. But you want us to rule, I think, that they had to increase the price. Don't you? No, Your Honor. There are two different questions being posed here. It's indirect purchase position that the defendants created a world that does not exist, one where costs increase. When those questions are asked to market participants, their answer is no, an increase in cost is not passed on because that is not what happens in the real world. When the question and the narrative is posed by the indirect purchaser, and this is the version that we would present to the jury, this was a cost-declining market. And when cost to any participant in the distribution channel happened, there was a cost decrease of their purchase price. They would then pass on that discount all the way to the consumer. And there was plenty of record evidence that spoke to this. So it was a difference between the indirect purchaser's evidence of a cost-declining market and questions posed by the defendants to witness participants that we believed presented a hypothetical that didn't exist in the real world. There were no increasing costs. Therefore, there could have been no increase in cost passed on. Setting that aside and the econometric measurements, there were also documents that spoke to this issue. And it's almost uncontested in the economic literature that overcharge, that is systemic, long-term, and affects all participants in the marketplace, is passed on to consumers. So Dr. Flam talked about that economic literature. Dr. Lerner, defendant's expert, testified that he measured and expected 100% pass-through at the distribution level. So you have the OEMs making the computers, you have distributors that sell them, and then you have the retailers at the end. Dr. Lerner acknowledged 100% pass-through at that overcharge at the distributor level. Down to the retailer level, Dr. Snyder, another of the defendant's experts, he testified in the same courthouse, in trial, on behalf of Toshiba, one of the defendants, that he had measured 86% pass-through on computers sold at Best Buy. He said it was routine. He said he absolutely expected to see that level of pass-through. And yet that was in the LCD case. That's the LCD case. It's a different case. I've got admissibility problems with that. I'm not sure how far you're going to get with that. It's the same computers, though. It was the same computers. And Toshiba, at the time we brought summary judgment and opposed it, Toshiba was a party. But, counsel, it's easy to imagine. This one is tough for me. I don't want to spend a lot of your time on it, but it's easy to imagine other variables. It's a different component. We don't have the information in this record, in my view, to put a lot of weight there. Okay. I understand what you're saying, but it is exactly the same computers that were at issue in this case. Do you want to tell me why that would even be admissible? Well, it's a party admission. Dr. Snyder was speaking on behalf of Toshiba at the time. In a different case. Right. But the same measurements of pass-through. There is no unique pass-through regression model that is applied in optical disk drives versus the LCD case. Dr. Snyder didn't measure pass-through of the LCD in the computer. He measures pass-through at the computer level. There's not a component level pass-through that's measured. And so, in that way, it's directly applicable to this case. Setting that aside, let's look at the documents. They mirror exactly what it was that Dr. Flam measured through his regression model. We see in them this intense pressure to reduce the cost of the major system components. What are the documents that are strongest for your team? I want to make sure I've seen all of them. I would direct you to the one that I believe fairly encapsulates, which is ER1664. This is a Dell document that is looking at the cost of the optical disk drives. It says it's looking at the 8-centimeter support, and it's saying there's a cost savings of between 35 cents and a dollar on an optical disk drive if they leave out this 8-centimeter support. They acknowledge that it would be worse for class members, and yet they make the decision to change this part and give an inferior part to class members to save on the total cost of the computer. This is the document about the mini disk getting stuck. Is it that document? That's right, the higher risk of getting stuck issue. All right. So these documents show, and the testimony of ACER, another OEM confirms, ACER testified at 2058 that it would choose between components that went into computer to make sure that it met the price point that it intended. So this is the argument that goes to the price points of computers, that it's not possible the overcharge was passed through because there were certain sticky price points in the market. But Dr. Flam measured that through hedonic regression models, which are broadly used by the U.S. government, again accepted by the court as a common methodology that was reliably applied. He used these hedonics to measure that at a price point, let's say again a computer of $900 being sold at Best Buy, that if there was an overcharge that attached to this optical disk drive, that the OEMs and retailers worked together to swap out parts that would make a lesser value computer being sold to that class member. Does he give examples when that happened? Or does he say that he thinks that would have happened? We gave a large number of examples of the documents and the testimony. For example, of ACER. Where it actually happened? Where an inferior component part was substituted? There are the examples in the record at 46 through 51, and that Dr. Flam relies on at 1294. I went through each one of the examples at 46 through 51. Can you tell me which one you think is the strongest support for your opinion? I would refer back again to the ER1666 that we just discussed. Okay. Where after you end up taking away a part of a computer, it makes it a lesser value computer to the class member. There's plenty of record testimony that discusses how the optical disk drive is a key component, one of the critical ones in the computer, one of the ones that has larger value. It's called by Dell a critical component. Toshiba referred to it as a key part. It's comparable in size to other parts such as the battery, the hard drive, RAM, and the video board. If you look at ER1681, it's another Dell document, and it discussed if the cost target is not feasible, the program viability alternatives should be discussed. And this entire document is a feature comparison across models. So where Dell is not able to meet its cost target because, for example, one of the critical or all of the critical components are too high, it degrades the quality of the other components. ER1687, another Dell document, talks about market-driving competition and price pressure creates the need for better produced BOM costs. And they're discussing two different models that it's going to put forward. The Flam Declaration at ER1299 cites documents demonstrating where the cost of the optical disk drive itself was required the redesign of the computer, and this shows the practice at work. Economic theory says that the total cost of the computer is the value of all of its parts, and that basic economic theory was demonstrated by Dr. Flam, both through his Adonic models, but also the deposition testimony and the documents that were in the record before the court. You have five minutes. Would you like me to briefly address the Dell and HP limitation to the scope of the conspiracy? Use your time however you wish. Let me just briefly say, there were two versions of this conspiracy that were proffered by the two parties. The first from the indirect purchasers was that this was a broad conspiracy targeting the computer market. The version proffered by the defendants was that there were 22 separate agreements, sub-agreements, that focused on Dell and HP, and yet somehow, despite these 22 agreements and the almost constant communications between the defendants, they fought vigorously for all the other computers in the market. Plaintiffs believe that was not a compelling narrative, but let's assume for a minute that they were right. Let's assume that they did target only Dell and HP. Even then, in a conspiracy, a criminal conspiracy for example, there's a Pinkerton charge that's given to the jury. They are liable for the natural consequences of their acts. The record... I'll just say in the interest of time, I think you have a strong argument on this point. Thank you, Your Honor. I'll reserve the rest of my time. Good morning, and may it please the Court. Lisa Koss of Blank Rome. I'm here on behalf of the Appellees Ben-Q Corporation and Ben-Q America Corp. Your Honors, the District Court correctly ruled at summary judgment that the plaintiff class had failed to meet its burden to present evidence sufficient to create a genuine issue for trial as to the essential elements of their claim, injury, causation, and damages. Because their evidence is not sufficient, because their expert testimony was not sufficient to permit a reasonable jury to infer that any ODD overcharge was consistently passed through all the levels of the distribution chain down to the indirect purchaser class members. This Court should affirm that decision for two reasons. Plaintiff's expert's theory of injury in his opinion lack validation by evidence of actual market facts. That's consistent with the Supreme Court's directive in Brooke Group. This Court's holdings in Rebel Oil and Online DVD. There was also independently undisputed evidence... Ms. Kass, just a second. Would you meet Ms. Scarlett's argument that we're not involved here in a market where the prices are being raised. We're involved in a market where the conspirators, and there's no question they were conspirators, were attempting to stop the prices from going down. If in the depositions the conspirators all said that if there was a decrease in the price of the product, the ODD, they would reduce the price, why isn't that sufficient evidence on a motion for summary judgment to carry the day? Your Honor, I'm actually glad you... Or is it for Ms. Scarlett? I'm glad you asked that question. It's not quite correct to represent the record in that regard. There was testimony from third-party retailers and a distributor, not just regarding cost increases being passed through, but they did testify, and this is on page 26 of our brief in the long footnote, and all the record sites are there. A number of them did testify as to cost changes or specifically cost decreases. Those would not consistently be passed on. That includes Dell, HP, Walmart, Fry's, and the distributor ASI. That's, again, on page 26. Suppose some said that they wouldn't pass on the cost decrease, but others said that they would. Why isn't that sufficient? There has to be pass-through, Your Honor, and we're speaking here of pass-through of ODD, a higher but-for ODD cost into price. The people who said there wouldn't be pass-through may be disbelieved by the jury, and the people who said there was a pass-through would be believed by the jury. Well, Your Honor, there has to be consistent pass-through. Dr. Flom's theory was that there was pass-through 100% of the time. And the jury might find that there is consistent pass-through by discrediting the witnesses who said there was no pass-through. I understand your point, Your Honor. So if there is... Is it your point that there is not sufficient evidence on a motion of summary judgment for a pass-through in a decreasing price market if only some of the distributors or some of the retailers recognize the pass-through? Yes, Your Honor. It's got to be unanimous? That is our position. And do you have a case that tells us that? Again, I would refer, Your Honor, back to Brook Group and Online DVD Rental, where not only was the evidence insufficient to support the theory that the expert put forward, which, again, here is 100% pass-through all of the time, there was contradictory, undisputed record evidence that questioned that theory. We have this same situation in this case, Your Honor. So the answer to Judge Bea's question is that it is... That's not a principle that comes from our case law. The problem is that... I think your problem, or your point, is that the expert's report isn't supported by the evidence. And to get to Judge Bea's point, the expert, Dr. Phlam, testified 100% pass-through 100% of the time. Is that right? That's correct, Your Honor. And that's the burden that the plaintiffs bore at summary judgment to present sufficient, specific facts to permit a reasonable inference that his theory actually occurred in market reality. And it's our position that the evidence, such as it is, from the percipient witnesses that we've put forward that call into doubt his theory, that there can be no reasonable inference such that there's a genuine issue for trial on those points. So I would like to take a minute to address the documents that Ms. Scarlett raised as what she called her best evidence. And I'll start by just telling the court that I don't want to spend too much time going through all of them one by one, but there are some categories to which these documents fall into that I think could be helpful to understand. There are, if you go through the plaintiff's briefs in this case, a total of 16 documents that they say are the evidence that the district court, they claim, ignored at summary judgment. First of all, none of those documents were presented to the court in their opposition to the summary judgment motion. Two of them were raised at the summary judgment hearing. The other 14 were not presented as creating a genuine dispute of fact sufficient to defeat summary judgment. That's despite the extended colloquy at the summary judgment hearing where the district court repeatedly pressed the plaintiff's counsel for any evidence in support of their quality-adjusted theory of injury. Counsel pointed repeatedly to testimony by the retailer, Circuit City, and then raised two of these Dell and HP documents. Which two were raised before the district court at that hearing, please? The two that were raised are one that Ms. Scarlett mentioned. That's at ER-1663. That's the mini-drive document? That's correct. Mini-disc, I mean, yeah. The 8-centimeter support issue. The other is ER-1889, which I don't believe she mentioned. But to address ER-1889. Right, which one is that? Oh, which one is it? This is a document where HP is stating that it will continue to use a DVD-ROM and changing it would impact $6 to our GM and not a good option for us, I believe is the quote from the document. The document shows HP deciding not to upgrade the ODD in its VISTA model from a DVD-ROM to a DVD-writer because of the greater cost. But obviously upgrading the ODD itself is what we're talking about here, is going to result in a higher cost. It's a better ODD. So this is not an example of a higher but for ODD cost being offset by swapping out some other component, reducing in lesser quality. But to address the documents that Ms. Scarlett raised, the document that was presented to the district court at the summary judgment hearing only shows Dell seeking to save again on the cost of the ODD itself. It does discuss removing an 8-centimeter support feature, but it also discusses, if you look at the document in its whole, retaining another feature, which is an emergency eject, that's maintained to deal with the risk of stuck media that could be caused by removing the 8-centimeter support feature. So there's no quality reduction when you look at the overall product shown in this document. Also importantly, that is a document that postdates the class period. It's from February of 2009. So it's not even within the class period. Ms. Scarlett also mentioned that the ACER testimony is consistent with that. The plaintiffs have selectively quoted from that deposition. The ACER deponent was asked a direct question, whether they ever substituted or swapped out or adjusted features, configuration of their computers to offset ODD cost. The answer was clearly no. And she said, the deponent said, that was because doing so could impact smooth operation of their production lines. The other documents that are within this set fall into a number of categories. I mentioned one category. That's documents that postdate the class period. There's actually three of those 16 Dell HP documents that fall into that category. That's ER 1657, 1666, and 1684. There are six of the documents that don't concern the ODD models that are at issue in this case or don't concern optical disk drives at all and are therefore irrelevant. That's ER 1872, 1879, 1884, 1899, 1904, and 1911. There are two documents that reflect nothing but an OEM trying to save on cost generally. That's unremarkable. That's ER 1681 and 1894. And there are five documents that while they do discuss possible changes to components, they're either talking about, as one example I gave, a change to the ODD itself or changing other features that have no connection at all to hitting a specific focal price point. And remember, that's the reason why this quality adjustment theory was put forth at class certification in the start was because of focal point pricing. There had to be, in Flom's words, a way that that was dealt with because his regressions were showing 100% pass-through. It must be, he said, that the computer OEMs were adjusting quality because there was no other way for him to get to pass-through when you have the prevalence of focal point pricing in the industry. So those last five documents are ER 1633, 1644, 1647, 1653, and 1892. And nor do they show in any case, any of these documents, that these changes to configuration ever occurred, that this decision-making ever happened in the market, was ever implemented to offset an ODD cost, a higher but for ODD cost. There were also three pieces of deposition testimony. Again, I mentioned the Circuit City testimony. There was also a piece of testimony by ACER, which I've described, and Ingram Micro. Those were discussed in the summary judgment order. That's at ER 19, I believe. So the court did not ignore those. It considered them. The district court, in its summary judgment order, also discussed 11 pieces of evidence that were cited in Dr. Flom's report under his heading, Documentary Evidence of Impact to Indirect Purchasers. And those were found not probative of the issue. Just to briefly address limitation of damages to Dell and HP. As the court recognized, this isn't an issue that it will need to reach at all if it affirms on the pass-through decision. The district court did rule that the conspiracy that could survive summary judgment was limited to one targeting Dell and HP. The class plaintiffs knew this was a possible outcome, and that's why the issue was discussed below. The reason they hedged at Class Cert and proposed an HP and Dell subclass was for this precise reason. And now they have the problem of causation. There is a rule of antitrust injury that requires a showing that you can only recover for injuries that are caused by and traceable to the anti-competitive aspect of the conduct and not any lawful conduct or other market factors. That's clear in the case law. That's the same for Sherman Act versus Cartwright Act. There has to be a causal link between the antitrust violation and the damages that are sought by the plaintiff class. But counsel, in fairness, they know that, and they announced a theory to explain why if those two, because they were the 800-pound gorilla, if that moved the market that others could be affected. So could you speak to that? Why are they wrong about that? Yes, and that is for the same reason that Pham's analysis regarding pass-through is not sufficient standing alone with the absence of market facts to validate it. Here there's no evidence in the record whatsoever of any mechanism through which pricing conduct toward Dell and HP could somehow permeate the rest of the market. Now, they make a lot of the fact that these were powerful buyers, Dell and HP, obviously they're buying high volumes of this product. It's not remarkable at all that they're going to be achieving some of the best pricing in the industry. So the fact that others might have been charged more does not show causation and the analysis that Dr. Pham performs, the Granger causality and the co-integration, those are, again, those are correlations. They don't demonstrate legal causation. And with regard to Granger, we're not aware of that ever being used to support legal causation in the summary judgment context where plaintiff class members do need to establish the element of injury. We also have an alternative argument that I just want to touch on very briefly if the court recalls from our briefing. And, again, this is an issue that the court would not need to reach if it affirms on pass-through. But my clients, BenQ Corporation and BenQ America Corp., would like the court to respectfully consider this argument should it need to reach it. BenQ is a Taiwanese company that's been, was in the ODC for a number of years. It was an ODD manufacturing business in the past until leaving the business in 2006, during which time it primarily was manufacturing ODDs for other entities, other suppliers, including Philips, as well as its own branded drives that were sold into the channel. It was also the minority shareholder in a joint venture called PBDS with Philips until selling that interest in 2006. And it manufactured ODDs pursuant to Philips instructions, pursuant to the specifications that Philips received from HP and Dell, which Philips then, in turn, sold to HP and Dell. Philips, in other words, was BenQ's customer. The facts here, however, are undisputed that neither BenQ entity ever sold ODDs to Dell and HP. They were not qualified to bid in their procurement events. They never did place bids in their procurement events, and that's important because of the limited scope of the conspiracy that survived summary judgment and because also the court below held that the BenQ defendants were not vicariously liable for the conduct of Philips or PBDS, which would include their dealings with Dell and HP. When you refer to procurement events, are you talking about the auctions that I read about? Auctions, ERFQs, those events. Yes, Your Honor. So as a result of that, there's a total lack of evidence that could support any reasonable inference that the BenQ defendants participated in the conspiracy as it's been narrowed. I believe in their reply brief, the plaintiffs suggested that the one document, which is ER2650-56 that they relied on as evidence of BenQ's involvement in the broader conspiracy, that that somehow would suggest that they were implicated in this more narrow conspiracy. However, the class counsel themselves at the summary judgment hearing used this document to argue that it must be a broader conspiracy because the personnel involved in that document were not the personnel responsible for the Dell and HP business. Could you give me that ER number again, please? Yes, ER2650. And the sites where class counsel recognized that is at ER195, and you can also see ER2382. The document on its face does not mention Philips either, which, of course, as I mentioned, is the only entity that was selling BenQ manufactured drives to either Dell or HP at that time. 2650, excuse me, counsel, I want to make sure I have this right, but I might have a typo. Is 2650 the one that says it has agreed to make an effort to stabilize the price in the future to realize reasonable profit? Yes, Your Honor, that's the translation of the original Korean document. Okay, I have a typo in it. Thank you. So as I was saying, the document itself does not mention Philips, and Philips is the only entity that had pricing authority to Dell and HP at that time, not BenQ. And for that, you can see SER992, SER1004 to 1005, and ER6159. Plaintiffs have cited in their reply brief a snippet from the deposition of a former BenQ sales manager and senior executive in which they claim that he's supporting the fact that he did have pricing authority for these transactions, but the document read in context and the document that he's talking about in his deposition is only showing pricing authority of Philips, pricing authority of BenQ for sales to Philips. So again, it's our position that no reasonable juror could infer based on this evidence that there was a participation by the BenQ defendants in the narrower conspiracy. I see that I'm about to run out of time, so I just want to leave the Court with a couple of points. This case is about a theory that was put forward at Class Cert to deal with the realities of the market. That's the quality-based injury theory. At summary judgment, the plaintiffs were unable to come up with any evidence to support the theory. We are not saying that the regression methodologies that Dr. Flom employed are unreliable. Certainly, they passed Daubert. We're not saying, as counsel suggested, that his report itself was not evidence. The fact that he relied on transactional data, that's completely circular. That would be allowing the input into the model to validate the results. At summary judgment, we're concerned with the expert's conclusions and the validity of those conclusions. So again, at summary judgment, total absence of real-world evidence to support the theory of injury. Reversing the District Court on this issue would be inconsistent with the precedent of the Supreme Court and of the Circuit. And a decision affirming summary judgment, to the extent the Court is concerned, would not mean that indirect purchaser cases can never get before the jury. This is limited to the facts of this case. Unless there are further questions, we'll submit further on a brief. Thank you. This is Shanna Scarlett again, on behalf of the appellants. I'd like to just briefly go back to the pass-through issue. The Court was discussing with counsel for Ben Q whether or not 100% pass-through was required. And I'd just like to draw to the Court's attention one very stark error that was made in the District Court order. That was found at page 15, where he held that the indirect purchasers need to show that offsetting, or pass-through, would have occurred at 100% of the value of the overcharge, meaning that no link in the supply chain would have swallowed any portion of the overcharge. That is not the law, and that is not what Dr. Flam ever testified to. To be clear, indirect purchasers do not need to show a maximum amount of value at every point in time. Right, but wasn't that what Dr. Flam decided? He absolutely did not. If you look at his chart on excerpt of record 1346-47, which is the chart that has all of the different pass-through studies there, there is a broad variation in the pass-through rates. On his fixed effects model, it was between 68% pass-through to 151% pass-through. On his Adonic model, it was 77% pass-through to 151% pass-through. There's something called overshifting that happens in highly competitive markets, where pass-through is greater than 100%. That was not challenged here. But to conservatively measure damages, Dr. Flam capped any pass-through at 100%. So while it was on average 100%, it was certainly not Dr. Flam's testimony ever that pass-through was at 100% 100% of the time. It was merely that pass-through was uniformly positive. I take your correction, and I appreciate it. Thank you. And turning to the retailer and the testimony of all the depositions and the declarations that are in the record regarding pass-through, that presents itself a very fundamental disputed fact that exists here in the record. The plaintiffs, as the non-movements for summary judgment, were entitled to all inferences in their favor. The district court credited none of the inferences in their favor on this point. Those declarations and deposition transcripts of those participants within this industry present a material question. Was the defendant's narrative correct that if a cost increase existed, it would not have been passed on? Plaintiffs would have presented evidence that in this cost-declining market, the cost discounts would have been passed on in a uniformly positive way, albeit not at 100% 100% of the time. And that is exactly the type of triable question of fact that the jury should have had the opportunity to address. Even my colleague citing to footnote 26, there she brought your attention to a number of declarations. Those declarations were widely discredited during the litigation. They were offered in support of a class certification opposition. When we had the opportunity to depose those declarants, they either had zero foundation for what they had put forward. And at one of those depositions, the witness actually, for shuttle computers, started to invoke the Fifth Amendment. He was so concerned that what he had said under penalty of perjury was incorrect. So it's surprising to still have those declarations being cited by our opponents in footnote 26. In fact, when witnesses were deposed and they had the chance to put forward the full discussion of the market, it supported plaintiffs' narrative of the case. And it's that tale of the two competing narratives that the indirect purchaser class feel they should have been able to present to the jury. Opposing counsel said that just two of the documents you've talked about today were being pointed to at the hearing before the district court. Is that right? That may be right, Your Honor. I don't know that fact off the top of my head. The hearing went for nearly an entire day. I think the record was over six hours. There were multiple summary judgments, motions brought, as well as the Daubert and the decertification motion. There simply was a lot of evidence for the court to consider at the time. If there are no further questions, thank you very much. Thank you. Thank you very much. The case of the indirect purchaser class versus Samsung Electronics Company Limited is submitted. We thank counsel for their very illuminating argument. Thank you.
judges: Farris, Bea, Christen